UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| v. | : | **Case No:** 05-0320 (RWR) |
| MARIO SALVATIERRA-SAHONERO, | : | |
| Defendant. | : | |

### SENTENCING MEMORANDUM

Comes now the Defendant MARIO SALVATIERRA SAHONERO through counsel and pursuant to Fed R. Crim P. 11(c)(1)(C), Rule 32 and 18 USC 3553(a) submits the following memorandum for the court's consideration prior to his sentencing.

*Procedural Posture*

Mr. Sahonero pled to the superseding information on April 7th, 2006.[1] The case is currently scheduled for sentencing on June 19th, 2006 at 4:00 pm.

*Background*

Mr. Sahonero was initially charged in a criminal complaint, following his being shot during the execution of a search warrant on July 28th, 2005. The indictment with the drug charges followed the criminal complaint several weeks later. With respect to the **first count** of the indictment under 18 USC §111(a) 1 (assaulting a police officer with a dangerous weapon) he faced a **maximum** penalty of **twenty (20) years**. **Count Two** of the indictment charged him

---

[1] Count 1 of the superseding information charges the defendant with assaulting a law enforcement officer in violation of 18 USC 111(a) and carries a maximum term of incarceration of twenty (20) years imprisonment. Count 2 of the superseding information charges the defendant with a violation of the District of Columbia Code 22-4504(a); which carries a maximum term of incarceration of five (5) years.

with possession with intent to distribute marijuana in violation of 21 USC §841 (a)1 and 21 USC §841 (b)(1)(D). This section carries a **maximum** penalty of **five (5) years** unless he had a prior drug conviction in which case the maximum is ten (10) years.

As bad as the first two counts were, the exposure for counts three (3) and four **(4) were worse**. They alleged violations under 18 §USC 924 (c)(1)(A)(ii) and 18 §USC 924(c)(1). Sub-section (A)(ii) carries a **minimum sentence of seven (7) years. The statute required that this sentence run consecutive to any sentence for a drug trafficking conviction. Sub-section (c)(1)(C) carries a minimum mandatory sentence of twenty-five (25) years. That sentence must run consecutive to any other gun count. Hence, on the gun counts alone Mr. Sahonero was facing a MINIMUM term of thirty-two (32) years imprisonment, without the possibility of parole. IN SHORT HIS TOTAL EXPOSURE WAS FIFTY-SEVEN (57) YEARS.**

During the course of the various pre-trial hearings and off the record discussions with government trial counsel, it became apparent that police officers other than Allee Ramadhan intended to testify. Their testimony would have been dubious to the defense, but the jurors may have reached a different conclusion. In the end, Mr. Sahonero authorized counsel to negotiate a plea with the government. After deliberate and careful consideration of the risk he faced, he reluctantly accepted the negotiated terms and stipulation of facts. He would have preferred to have pled *Nolo Contendere,* but the government rejected that counter-offer. By pleading guilty to the charges in the superseding information, he places his status as a lawful resident in jeopardy and faces a certain jail term. On the other hand, he assures his freedom in less than forty-eight (48) months from the date of sentencing.

*Nature and Circumstance of the Offense*

As previously mentioned, MARIO SAHONERO was charged in a superseding indictment with various counts relating to drug distribution (marijuana) in violation of 21 USC § 841. He was also charged with the use, carrying and possessing of a handgun in connection with a drug trafficking offense, in violation of 18 USC §924 (c)(1)(A)(ii). Mr. Sahonero was shot in his home by Allee Ramadahan. Mr. SAHONERO was subsequently arrested and charged in a criminal complaint with assaulting the aforementioned Allee Ramadahan; who is employed with the Metropolitan Police Department.

Two people aside from Mr. Sahonero resided at 772 Harvard Street, NW. Unlike Mr. Sahonero, one of the other two residents immediately acknowledged ownership of the marijuana found in the house. He was sentenced in DC Superior Court to nine months incarceration, execution of the sentence was suspended and he was placed on probation. None of the baggies containing marijuana found in the common areas of the home had Mr. Sahonero's fingerprints on them. Moreover, there were no quantities of marijuana found on or about Mr. Sahonero's person that would indicate possession with intent to distribute. Nevertheless, because Mr. Sahonero lived in the basement portion of the row house, the government referenced all the contraband found in the lower unit, in its filings, in an effort to persuade the court that the items belonged to Mr. Sahonero.

*History and Characteristics of the Accused*

Mr. Sahonero is twenty-two years old. He is the second of four children born to Nora Sahonero. He came to the United States from Bolivia, when he was a toddler. He speaks English with no discernable accent. His parents separated when he was quite young. At the time of his parents' separation, his mother assumed custody. However, his mother did not have the parenting skills she has since developed. His stepfather was at best indifferent to him as a child.

After several abusive episodes, the Commonwealth of Virginia declared Mario Sahonero a child in need of assistance. He was placed in foster care, after attempts to reunite him with his biological father were unsuccessful.

Mr. Sahonero drifted from group homes to foster homes, to brief stays with his older sister and her husband before renting the basement at 772 Harvard Street, NW in Washington DC. It was at this location that he came in contact with the other residents who were part of a marijuana distribution network. He did not know any of the residents prior to moving into the row house. He befriended them after he had been living there several weeks.

### *Deterrence Value*

In terms of *general deterrence*, this case was not highly publicized and it is doubtful that Mr. Sahonero's conviction will do much to dissuade others from unlawfully possessing firearms. However, with respect to *specific deterrence* Mr. Sahonero is not likely to commit a similar offense again. To begin with he has no history of violence. Second, he is subject to immediate deportation, so does not pose a future threat to anyone in the United States. Third, he now lives with a bullet in his abdomen, which acts as a daily reminder of the dangers of possessing and brandishing a weapon. Hence, the public need not fear MARIO SALVATIERRA SAHONERO. He has learned a painful and costly lesson.

### *Physical and Mental Health*

Since his arrest, Mr. Sahonero has been restricted in his activities. As a result his weight has skyrocketed. He has a history of depression and has exhibited episodes of frustration over his incarceration, and the events that resulted in his shooting.

*Departure Consideration*

The guideline range for Count 1 is 8 – 14 months. While the guideline range for Count 2 is 6 – 24 months. Although, the Sentencing Guidelines Specialist reported that there are no factors that warrant a departure consideration, the court should know that Title 8, Section 1252(a) and USSG 5K2.0 authorizes a district court to make a downward departure from the sentencing guidelines based on alien status, *inter alia*. *See also*, *Koon v. United States*, 116 S.Ct. 2035, 2046 (1996). Moreover, on April 28, 1995, then United States Attorney; Janet Reno authorized federal prosecutors to recommend deportation or downward departure for convicted aliens.[2]

Such a departure is appropriate in cases of imminent or likely notification to the Immigration and Naturalization Service by the United States Probation Office that a defendant will be deported upon completion of his sentence. As a result of the deportation notice, convicted foreign nationals are subjected to harsher terms and conditions of incarceration. To begin with, they are not eligible for early release or transitional programs. Hence, they never see the benefit of community correction during their incarceration (e.g., half-way house confinement). Nor are they able to serve any part of their sentence in a minimum-security prison.[3] Of course Mr. Sahonero is barred under the terms of the plea agreement from seeking such a departure, but counsel feels that the court should be made aware that the PSR was inaccurate on this last point.[4]

---

[2] The referenced memorandum announced a policy that favored the deportation of convicted foreigners from the United States as expeditiously as possible. The same policy letter stated that prosecutors may agree to recommend a two-level downward departure from the guidelines.

[3] *See,* Federal Bureau of Prisons Program Statement 5100.04 (Security Designation and Custody Classification Manual, Chp 2-9 (June 15, 1992).

[4] (*See, United States v. Smith,* 430 F.3d 1177 (DC Cir 2005). The theory being that there is no need to train or educate foreign nationals who will be deported upon completion of their sentence. (*See*, 8 USC 1227((a)(2)(A)(iii) which lists assault as a deportable offense.)

*Prayer*

WHEREFORE, he respectfully requests that:

1. That the court make a recommendation against deportation;

2. For such other and further relief that the interest of justice and the public good demands.


                        Respectfully submitted,
                        ANTHONY D. MARTIN


By:    _____
        Anthony D. Martin, Esquire
        Belle Point Office Park
        7841 Belle Point Drive
        Greenbelt, MD 20770
      (301) 220-3700; (301) 220-0791